1  TARA K. MCGRATH
   United States Attorney
2  MICHELLE L. WASSERMAN
   California Bar No. 254686
3  CARLING DONOVAN
   New York Bar
4  PATRICK SWAN
   California Bar No. 306526
5  Assistant United States Attorneys
6  Federal Office Building
   880 Front Street, Room 6293
7  San Diego, California 92101-8893
   Telephone: (619) 546-8431
8  Email: michelle.wasserman@usdoj.gov

9  Attorneys for United States of America

**FILED**

APR 1 6 2024

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                    DEPUTY

10        **UNITED STATES DISTRICT COURT**

11        **SOUTHERN DISTRICT OF CALIFORNIA**

12  UNITED STATES OF AMERICA,          Case No. 24-cr-00759-TWR

13          v.

14                                      PLEA AGREEMENT

15  CAMBRIDGE INTERNATIONAL
    SYSTEMS, INC.,
16

17          Defendant.

18
        IT IS HEREBY AGREED between the plaintiff, UNITED STATES OF AMERICA,
19
    through its counsel, TARA K. MCGRATH, United States Attorney, Michelle L.
20
    Wasserman and Carling Donovan, Assistant United States Attorneys, and Defendant
21
    CAMBRIDGE INTERNATIONAL SYSTEMS, INC. ("CAMBRIDGE"), with the advice
22
    and consent of Claire Rauscher and Sarah Motley Stone, counsel for CAMBRIDGE as
23
    follows.:
24
                                    **I**
25
                                **THE PLEA**
26
        A. The Charge
27
         Defendant agrees to waive Indictment and plead guilty to an Information, charging
28
    Defendant with conspiracy to commit bribery in violation of 18 U.S.C. § 371.

CAMBRIDGE Plea Agreement                              Def. Initials

In addition, Defendant consents to the forfeiture allegations of the Information. Defendant agrees the attached forfeiture addendum is incorporated by reference and shall govern forfeiture in this case.

B. Prosecution of Additional Counts

In exchange for Defendant's plea of guilty, the United States agrees that it will not file additional criminal charges against Defendant for the conduct described in the attached Statement of Facts or based on information now known to the United States related to the offense conduct described in the attached Statement of Facts provided that Defendant does not breach the plea agreement, or the guilty plea entered pursuant to this plea agreement is not set aside for any reason. If Defendant breaches this agreement or the guilty plea is set aside, Section XIV below shall apply.

Nothing in this agreement, however, shields Defendant from prosecution for any act or omission not now known to the United States or committed after the date of this agreement. The United States remains free to prosecute Defendant for perjury, false statements, or obstruction of justice if the Defendant commits such an offense after Defendant signs this plea agreement. Should Defendant commit perjury, give false statement, or commit obstruction of justice, the United States, at its sole discretion, will be free to prosecute Defendant for that offense, move to set aside this plea agreement, and/or be relieved of its obligations under this agreement.

## II

## NATURE OF THE OFFENSE

A.    ELEMENTS EXPLAINED

The offense to which Defendant is pleading guilty has the following elements:

1. There was an agreement between two or more persons to commit the crime of bribery, in violation of Title 18, United States Code, Section 201;

Plea Agreement

2

Def. Initials

2.    Defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

3.    One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

B.    <u>CORPORATE CRIMINAL LIABILITY</u>

Defendant acknowledges that as a corporation it is responsible for the acts of its agents or employees, done within the scope of their authority.  Defendant acknowledges that the acts of a corporation's agents or employees are within the scope of their authority if those acts are done, at least in part, on the corporation's behalf or for its benefit in the performance of the agent's general duties.  Defendant agrees that it is responsible for the acts of its officers, employees and agents, which form the factual basis for the charge to which Defendant is agreeing to plead guilty.

C.    <u>ELEMENTS UNDERSTOOD AND ADMITTED – FACTUAL BASIS</u>

Defendant has fully discussed the facts of this case with counsel.  Defendant agrees that it, through its officers, directors, and employees, committed each element of the crime and admits that there is a factual basis for this guilty plea. The facts laid out in the attached Statement of Facts are true and undisputed and had this case gone to trial, the United States would have presented evidence to prove them beyond a reasonable doubt.

### III

### PENALTIES

The crime to which Defendant is pleading guilty carries the following maximum penalties:

A.    a maximum 5 years of probation;

B.    a maximum $500,000 fine, or twice the gross gain or loss resulting from the offense, whichever is greatest (18 U.S.C. §3571(c)(3), (d));

C.    a mandatory special assessment of $400 per count (18 U.S.C. § 3013(a)(2)(B)); and

D.    an order of forfeiture requiring Defendant to forfeit the proceeds of the offense.

## IV
### DEFENDANT'S WAIVER OF TRIAL RIGHTS AND UNDERSTANDING OF CONSEQUENCES

This guilty plea waives Defendant's right at trial to:

A.    Continue to plead not guilty and require the United States to prove the elements of the crime beyond a reasonable doubt;

B.    A speedy and public trial by jury;

C.    The assistance of counsel at all stages;

D.    Confront and cross-examine adverse witnesses;

E.    Testify, present evidence, and have witnesses testify on Defendant's behalf.

F.    Not testify or have any adverse inferences drawn from the failure to testify; and

G.    Assert now or on appeal, any legal, constitutional, statutory, regulatory, and procedural rights and defenses that it may have under any source of federal or common law, including among others, challenges to personal jurisdiction, extraterritoriality, statute of limitations, venue, and the form and substance of the Information, including specifically any claim of multiplicity, duplicity, or merger.

## V
### DEFENDANT ACKNOWLEDGES NO PRETRIAL RIGHT TO BE PROVIDED WITH IMPEACHMENT AND AFFIRMATIVE DEFENSE INFORMATION

Any information establishing the factual innocence of Defendant known to the undersigned prosecutor in this case has been turned over to Defendant. The United States will continue to provide such information establishing the factual innocence of Defendant. If this case proceeded to trial, the United States would be required to provide impeachment information for its witnesses. In addition, if Defendant raised an affirmative defense, the United States would be required to provide information in its possession that supports such a defense. By pleading guilty Defendant will not be provided this information, if any, and

Defendant waives any right to this information. Defendant will not attempt to withdraw the guilty plea or to file a collateral attack based on the existence of this information.

### VI

### DEFENDANT'S REPRESENTATION THAT GUILTY PLEA IS KNOWING AND VOLUNTARY

Defendant represents that:

A.   Defendant, and its officers and board of directors, has had a full opportunity to discuss all the facts and circumstances of this case with defense counsel and has a clear understanding of the charges and the consequences of this plea. By pleading guilty, Defendant may be giving up, and rendered ineligible to receive, valuable government benefits and civic rights. The conviction in this case may subject Defendant to various collateral consequences, including but not limited to revocation of probation in another case; suspension or debarment from government contracting; and suspension or revocation of a professional license, none of which can serve as grounds to withdraw Defendant's guilty plea.

B.   No one has made any promises or offered any rewards in return for this guilty plea, other than those contained in this agreement or otherwise disclosed to the Court.

C.   No one has threatened Defendant or Defendant's officers, employees or agents to induce this guilty plea.

D.   Defendant is pleading guilty because Defendant is guilty and for no other reason.

### VII

### AGREEMENT LIMITED TO U.S. ATTORNEY'S OFFICE SOUTHERN DISTRICT OF CALIFORNIA

This plea agreement is limited to the United States Attorney's Office for the Southern District of California and cannot bind any other authorities in any type of matter, although the United States will bring this plea agreement to the attention of other authorities if requested by Defendant.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VIII
## APPLICABILITY OF SENTENCING GUIDELINES

The sentence imposed will be based on the factors set forth in 18 U.S.C. § 3553. In imposing the sentence, the sentencing judge must consult the United States Sentencing Guidelines ("Guidelines" or "USSG") and take them into account. Defendant has discussed the Guidelines with defense counsel and understands that the Guidelines are only advisory. The Court may impose a sentence more severe or less severe than otherwise applicable under the Guidelines, up to the statutory maximum. The sentence cannot be determined until a presentence report is prepared by the U.S. Probation Office and defense counsel and the United States have an opportunity to review and challenge the presentence report. **Defendant agrees to request that a presentence report be prepared.** Nothing in this plea agreement limits the United States' duty to provide complete and accurate facts to the district court and the U.S. Probation Office.

## IX

## SENTENCE IS WITHIN SOLE DISCRETION OF JUDGE

This plea agreement is made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B). The sentence is within the sole discretion of the sentencing judge who may impose the maximum sentence provided by statute. It is uncertain at this time what Defendant's sentence will be. The United States has not made and will not make any representation about what sentence Defendant will receive. Any estimate of the probable sentence by defense counsel is not a promise and is not binding on the Court. Any recommendation by the United States at sentencing also is not binding on the Court. If the sentencing judge does not follow any or all of the parties' sentencing recommendations, and irrespective of the sentence imposed, Defendant will not withdraw its plea.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## X

## PARTIES' SENTENCING RECOMMENDATIONS

A.    SENTENCING GUIDELINES CALCULATIONS

Although the Guidelines are only advisory and just one factor the Court will consider under 18 U.S.C. § 3553(a) in imposing a sentence, the parties will jointly recommend the following Base Offense Level, Specific Offense Characteristics, Adjustments, Departures, and Culpability Score. The parties agree that Chapter 8 of the United States Sentencing Guidelines Manual governs the case.

| | |
|---|---|
| 1. Base Offense Level – USSG § 2C1.1(a)(2) | 12 |
| 2. More than One Bribe – USSG § 2C1.1(b)(1) | +2 |
| 3. Value of the Benefit – USSG § 2C1.1(b)(2)/ § 2B1.1(b)(J) (more than $3.5 million) | +18 |

B.    CULPABILITY SCORE

| | |
|---|---|
| 1. Base Level - USSG § 8C2.5(a) | 5 |
| 2. More than 50 employees/person with substantial authority participated in the offense - USSG § 8C2.5(b)(4) | +2 |
| 3. Affirmative Acceptance - USSG § 8C2.5(g)(3) | -1 |

The total base fine calculation of 32 results in a base fine for Defendant of $30,000,000. USSG § 8C2.4(d). Defendant's Minimum and Maximum Multipliers, based on the foregoing aggregate culpability score of 6 are 1.2 and 2.4, respectively, resulting in a total fine range of $36,000,000 to $72,000,000. USSG §8C2.6. This range is limited by the statutory maximum of twice the gross gain or loss to $14,859,990.46.

C.    ACCEPTANCE OF RESPONSIBILITY

Despite paragraph B above, the Government need not recommend an adjustment for Affirmative Acceptance if Defendant engages in conduct inconsistent with acceptance of responsibility including, but not limited to, the following:

1. Fails to truthfully admit a complete factual basis as stated in the plea at the time the plea is entered, or falsely denies, or makes a statement inconsistent with, the factual basis set forth in this agreement;

2. Falsely denies prior criminal conduct or convictions;

3. Is untruthful with the Government, the Court or probation officer; or

4. Breaches this plea agreement in any way.

D.   FACTUAL BASIS" AND "RELEVANT CONDUCT" INFORMATION

The facts in the "factual basis" paragraph of this agreement are true and may be considered as "relevant conduct" under USSG § 1B1.3 and as the nature and circumstances of the offense under 18 U.S.C. § 3553(a)(1).

E.   PARTIES' RECOMMENDATIONS REGARDING FINE/SPECIAL ASSESSMENT/FORFEITURE

1. Special Assessment

The parties will jointly recommend that Defendant pay a special assessment in the amount of $400.00 to be paid forthwith at time of sentencing.

2. Fine

The United States will recommend that Defendant be sentenced to pay a fine at the low end of the advisory guideline range recommended by the Government at sentencing. Defendant remains free to request or recommend that the Court impose a lower fine amount, or no fine at all.

3. Forfeiture

Defendant consents to the forfeiture allegations of the Information and agrees to the entry of a forfeiture money judgment against it in the amount of $ 1,672,102.23. The parties further agree that the attached Forfeiture Addendum will govern Forfeiture in this matter.

Def. Initials 

F.    <u>PROBATION</u>

The parties are not recommending that the Court impose a term of probation.  If the Court imposes a term of probation, Defendant will not seek to reduce or terminate early the term of probation until Defendant has served at least 2/3 of the term and has fully paid and satisfied any special assessments, fine, or criminal forfeiture judgment.

XI

**FACTUAL ADHERENCE**

Defendant agrees that it shall not, through its present or future attorneys, board of directors, officers, or any other person authorized to speak for Defendant, or any parent company, subsidiaries, affiliates, successor entities or assignees, make any public statement, in litigation or otherwise, contradicting Defendant's acceptance of responsibility, as set forth herein and/or in the Statement of Facts. Any such contradictory statement shall constitute a breach of this plea agreement and Defendant thereafter would be subject to prosecution. Defendant agrees that the decision of whether any public statement by any such person contradicting Defendant's acceptance of responsibility or a fact contained in the Statement of Facts will be imputed to Defendant for the purpose of determining whether Defendant has breached this plea agreement shall be at the sole discretion of the United States. Should the United States decide that a public statement made by any such person contradicts in whole or in part Defendant's acceptance of responsibility or a factual statement in the Statement of Facts, the United States shall notify Defendant. Defendant may avoid a breach of this plea agreement by publicly repudiating such statement within two business days after receipt of such written notification. This paragraph does not apply to any statement made by an individual employed by Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on Defendant's behalf.

Plea Agreement                                                                                        Def. Initials

## XII

## **COOPERATION AND DISCLOSURE REQUIREMENTS**

Defendant agrees to continue cooperating fully with the United States, and with any other agency designated by the United States, in investigating Defendant and any of its present and former officers, employees, consultants, contractors, and subcontractors in all matters. Defendant agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

A.      Complete, timely, and truthful disclosure of all non-privileged information as may be requested by the United States with respect to the activities of Defendant and its subsidiaries and affiliates, and its present and former officers, employees, consultants, contractors, and subcontractors, concerning all matters inquired into by the United States;

B.      Assembling, organizing, and producing (in any method and format requested by the United States) any and all non-privileged relevant documents, records, electronic data, or other tangible evidence in Defendant's possession, custody, or control concerning all matters inquired into by the United States. Whenever such data is in electronic format, Defendant shall provide access to such data and assistance in operating computer and other equipment as necessary to retrieve data. This obligation shall not include production of materials covered by the attorney-client privilege or the work product doctrine;

C.      Using Defendant's best efforts to facilitate the availability and cooperation of its present and former officers, employees, consultants, contractors, and subcontractors to provide information and/or testimony as requested by the United States, including, but not limited to, sworn testimony in any proceeding, including before a federal grand jury or in federal trials, as well as interviews with domestic law enforcement and regulatory authorities;

D.      Providing testimony, certification, or other information to identify or establish the original location, authenticity, or other evidentiary foundation necessary to admit into evidence documents in any proceeding;

E.      Identifying witnesses who, to Defendant's knowledge, may have material information regarding the matters under investigation. With respect to any information, testimony, document, record, or other tangible evidence provided to the United States pursuant to this plea agreement, Defendant consents to any and all disclosure to other government agencies of such materials as the United States, in its sole discretion, deems appropriate;

F.      Bringing to the attention of the United States: (i) all allegations of criminal conduct by Defendant or any of its employees acting with the scope of their employment related to the United States' investigation, as to which Defendant's board of directors, officers, senior management, or United States legal and compliance personnel are aware; (ii) any administrative, regulatory, civil, or criminal proceeding or investigation of Defendant relating to the investigation of the United States; and

G.      Committing no crimes under the federal laws of the United States subsequent to the execution of this plea agreement.

## XIII

## DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK

Defendant waives all rights to appeal and to collaterally attack every aspect of the conviction and sentence. This waiver includes, but is not limited to, any argument that the statute of conviction or Defendant's prosecution is unconstitutional and any argument that the facts of this case do not constitute the crime charged. The only exceptions is that Defendant may collaterally attack the conviction or sentence on the basis that Defendant received ineffective assistance of counsel. If Defendant appeals, the Government may support on appeal the sentence actually imposed.

## XIV

## BREACH OF THE PLEA AGREEMENT

Defendant and Defendant's attorneys know the terms of this plea agreement and shall raise, before the sentencing hearing is complete, any claim that the United States has

11

Plea Agreement

Def. Initials

not complied with this plea agreement. Otherwise, such claims shall be deemed waived (that is, deliberately not raised despite awareness that the claim could be raised), cannot later be made to any Court, and if later made to a Court, shall constitute a breach of this plea agreement.

Defendant breaches this agreement if Defendant violates or fails to perform any obligation under this agreement. The following are non-exhaustive examples of acts constituting a breach:

1. Failing to plead guilty pursuant to this agreement;

2. Failing to fully accept responsibility as established in Section X, paragraph C, above;

3. Failing to appear in court;

4. Attempting to withdraw the plea;

5. Failing to truthfully admit a complete factual basis as set forth in the Statement of Facts at the time the plea is entered or falsely denying or making any statement inconsistent with the Statement of Facts;

6. Failing to abide by any court order related to this case;

7. Appealing (which occurs if a notice of appeal is filed) or collaterally attacking the conviction or sentence in violation of Section XI of this plea agreement;

8. Failing to fully cooperate, as set forth in Section XII;

9. Failing to timely and fully comply with the Forfeiture Addendum;

10. Engaging in additional criminal conduct.

If Defendant breaches this plea agreement, Defendant will not be able to enforce any provisions, and the United States will be relieved of all its obligations under this plea agreement. For example, the United States may proceed to sentencing but recommend a different sentence than what it agreed to recommend above. Or the United States may pursue any charges including those that were dismissed, promised to be dismissed, or not

filed as a result of this plea agreement, (Defendant agrees that any statute of limitations relating to such charges is tolled indefinitely as of the date all parties have signed this agreement; Defendant also waives any double jeopardy defense to such charges). In addition, the United States may move to set aside Defendant's guilty plea. Defendant may not withdraw the guilty plea based on the United States' pursuit of any such remedy for Defendant's breach.

Defendant agrees that the decision whether conduct or statements of any individual acting on behalf or speaking on behalf of Defendant will be imputed to Defendant for the purpose of determining whether Defendant has knowingly violated any provision of this plea agreement shall be in the sole discretion of the United States. Should the United States determine that Defendant has breached the plea agreement, the United States will provide written notice to Defendant of the alleged breach.

Additionally, if Defendant breaches this plea agreement: (i) any statements made by Defendant's representative, under oath, at the guilty plea hearing (before either a Magistrate Judge or a District Judge); (ii) the Statement of Facts; and (iii) any evidence derived from such statements, are admissible against Defendant in any prosecution of, or any action against, Defendant. This includes the prosecution of the charge(s) that is the subject of this plea agreement or any charge(s) that the prosecution agreed to dismiss or not file as part of this agreement, but later pursues because of a breach by the Defendant. Additionally, Defendant knowingly, voluntarily, and intelligently waives any argument that the statements and any evidence derived from the statements should be suppressed, cannot be used by the Government, or are inadmissible under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, and any other federal rule.

Def. Initials 

## XVI

## **CONTENTS AND MODIFICATION OF AGREEMENT**

This plea agreement embodies the entire agreement between the parties and supersedes any other agreement, written or oral. No modification of this plea agreement shall be effective unless in writing, signed by all parties. There are no agreements, representations, or understandings between the parties in this case, other than those explicitly set forth in this plea agreement and the attachments and addendum hereto.

## XVII

## **DEFENDANT AND COUNSEL FULLY UNDERSTAND AGREEMENT**

By signing this plea agreement, Defendant certifies that Defendant and its officers, managers, and board of directors has read it and discussed its terms with defense counsel and fully understands its meaning and effect. Defendant acknowledges that it has accepted this plea agreement and decided to plead guilty because it is in fact guilty of the charged offense.

By virtue of the resolution of Defendant's board of directors (attached hereto as Attachment A), affirming that the board of directors has authority to enter into this plea agreement and has: (1) reviewed the Information in this case, the Statement of Facts, and the proposed plea agreement or has been advised of the contents thereof; (2) consulted with legal counsel in connection with the matter; (3) voted to enter into this plea agreement and to admit to the attached Statement of Facts; (4) voted to authorize Defendant to plead guilty to the charge specified in the Information; voted to authorize payment of the criminal fine; and (5) voted to authorize the corporate officer identified below to execute this plea agreement and all other documents necessary to carry out the provisions of this plea agreement, Defendant agrees that a duly authorized corporate officer for Defendant shall appear on behalf of Defendant and enter the guilty plea and will also appear for the imposition of sentence.

## XVIII

## **DEFENDANT SATISFIED WITH COUNSEL**

Defendant, through its officers, managers, and board of directors, has consulted with counsel and is satisfied with counsel's representation. This is Defendant's independent opinion, and Defendant's counsel did not advise Defendant, or any of its officers, managers, and board of directors, about what to say in this regard.

## XIX

## **SUCCESSOR LIABILITY**

This plea agreement shall bind Defendant, its subsidiaries, affiliated entities, assignees, and its successor corporation if any, and any other person or entity that assumes the obligations contained herein. No change in name, change in corporate or individual control, business reorganization, change in ownership, merger, change of legal status, sale or purchase of assets, divestiture of assets, or similar action shall alter Defendant's obligations under this plea agreement. Defendant shall not engage in any action to seek to avoid the obligations set forth in this plea agreement.

TARA K. MCGRATH
United States Attorney

DATED     3/28/24

Michelle L. Wasserman
Carling Donovan
Patrick Swan
Assistant U.S. Attorneys

DATED : 3|28|2024

Claire Rauscher
Sarah Motley Stone
Defense Counsel

Def. Initials

1
2  3\27\24
   DATED

Chris Sentimore
President/Board Member
Cambridge International Systems, Inc.
Defendant

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plea Agreement

Def. Initials

## COMPANY OFFICER'S CERTIFICATE

I, Chris Sentimore certify that I am the President for Defendant, Cambridge International Systems, Inc.

I have read this agreement and carefully reviewed every part of it with outside counsel for Cambridge International Systems, Inc. I understand the terms of the foregoing agreement, and the attachments and addendum hereto, and voluntarily agree, on behalf of Cambridge International Systems, Inc., to each of its terms. Before signing this agreement, I consulted outside counsel for Cambridge International Systems, Inc. Counsel fully advised me of Cambridge International Systems, Inc.'s rights, of possible defenses, of the relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.

I have further carefully reviewed the terms of this agreement, and the attachments and addendum hereto, with Cambridge International Systems, Inc.'s board of directors. I have caused Cambridge International Systems, Inc.'s outside counsel to advise its board of directors fully of Cambridge International Systems, Inc.'s rights, of possible defenses, of the relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.

//
//
//
//
//
//
//
//
//

1    I am further authorized to acknowledge on behalf Cambridge International Systems,

2  Inc. that these documents fully set forth Cambridge International Systems, Inc.'s agreement

3  with the United States, and that no additional promises or representations have been made

4  to Cambridge International Systems, Inc. by any officials of the United States in connection

5  with the disposition of this matter, other than those set forth in this agreement, and the

6  attachments and addendum hereto. Furthermore, no one has threatened or forced me, or, to

7  my knowledge, any person authorizing this agreement on Cambridge International

8  Systems, Inc.'s behalf, in any way to enter into this agreement. I am satisfied with outside

9  counsel's representation in this matter.

DATED: 3|27|24

Chris Sentimore
President/Board Member
Cambridge International Systems, Inc.
Defendant

## CERTIFICATE OF COUNSEL

I am counsel for Cambridge International Systems, Inc. in the matter covered by this agreement. In connection with such representation, I have examined relevant Cambridge International Systems, Inc. documents and have discussed the terms of this agreement with Cambridge International Systems, Inc.'s board of directors. I have fully advised them of Cambridge International Systems, Inc.'s rights, of possible defenses, of the relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.

Based on our review of the foregoing materials and discussions, I am of the opinion that _Chris Sentimore_, the representative of Cambridge International Systems, Inc. has been duly authorized to enter into this agreement on Cambridge International Systems, Inc.'s behalf; that this agreement has been duly and validly authorized, executed, and delivered on Cambridge International Systems, Inc.'s behalf; and that this agreement is a valid and binding obligation of Cambridge International Systems, Inc. To my knowledge, Cambridge International Systems, Inc.'s decision to enter into this agreement, based on the authorization of the board of directors of Cambridge International Systems, Inc., is an informed and voluntary one.

DATED:

_____
Claire Rauscher
Attorney for Cambridge International Systems, Inc.

## Statement of Facts

Defendant Cambridge International Systems, Inc. ("CAMBRIDGE" or "Company") is headquartered in Arlington, Virginia and is a contractor of services to the government and other entities. It also has offices in Charleston, South Carolina and Tampa, Florida, among others.

Russell Thurston (charged elsewhere) ("Thurston") was hired in 2013 as the Vice President of Defense and Intelligence at CAMBRIDGE. Thurston handled the defense and intelligence business line which involved U.S. government contracts. Thurston ran these government contracts out of the Charleston, South Carolina offices from 2014 until 2021, when he was terminated. In 2019, Thurston was promoted to Executive Vice President of Advanced Technologies and Services Division and continued to oversee U.S. government contracts.

Employee-2 worked as a Program Manager at CAMBRIDGE, under the direction of Thurston.

From 2006-2019, James Soriano (charged elsewhere) ("Soriano") was an employee at the Naval Information Warfare Center ("NIWC"), previously known as the Space and Naval Warfare Systems Center ("SPAWAR"), in San Diego, California where he worked as an engineer and project lead. NIWC was a command of the United States Navy, a branch of the United States Department of Defense ("DoD"), which was a Department of the United States Government. In this capacity, Soriano was a public official, as defined in 18 U.S.C. § 201. Soriano was also certified as a Contracting Officer Representative (COR). As a COR, Soriano had the responsibility to approve contractor invoices, conduct contract performance reviews, and oversee contractor performance among other official duties. In his role at NIWC, Soriano had the ability to influence the award of defense contracts.

Individual-2 had his own consulting business in Tampa, Florida. From approximately December 2014 to 2019, Individual-2 worked for CAMBRIDGE as consultant and was supervised by Thurston. Individual-2 shared information between Soriano and Thurston and CAMBRIDGE.

Liberty Gutierrez (charged elsewhere) purported to work full time as a Senior Management Analyst at CAMBRIDGE from approximately April 2017 through 2019. Gutierrez did little to no work for CAMBRIDGE. While working for CAMBRIDGE, Gutierrez gave half of her monthly salary, or approximately $2,000 per month, in cash to Soriano. At the same time Gutierrez was purportedly working

full time for CAMBRIDGE, she also had full time jobs at two other defense contractors as well as a full-time job at a real estate and mortgage company in San Diego, California.

Beginning in or before June 2014, and continuing through at least October 2019, Russell Thurston and Employee-2 acting as agents for CAMBRIDGE agreed with James Soriano, Individual-2 and others to commit bribery. Specifically, Thurston and Employee-2 acting as agents of CAMBRIDGE along with Individual-2, agreed to directly or indirectly, corruptly give, offer, and promise things of value to Soriano, a public official, specifically jobs for Soriano's family and friends, meals, and a ticket to a premier sporting event, with the intent to influence Soriano in the performance of official acts and to induce Soriano to do or omit to do acts in violation of his lawful duties.

As part of the conspiracy and as part of the stream of benefits to Soriano CAMBRIDGE's employees gave various things of value to Soriano, all of which were overt acts in furtherance of the conspiracy. CAMBRIDGE, through its employees, did so corruptly, that is with the intent to influence an official act by Soriano, or to induce Soriano to do or omit to do an act in violation of his lawful duty, as opportunities arose. Specifically, CAMBRIDGE's employees paid for the following meals for Soriano:

a) On January 26, 2017, Thurston took Soriano to lunch at Shino Sushi & Kappo in San Diego, CA, totaling $72.19. Thurston expensed the meal to CAMBRIDGE.

b) On January 27, 2017, Employee-2 took Soriano to lunch at Coasterra in San Diego, CA, totaling $88.25. Employee-2 expensed the meal to CAMBRIDGE as a business meal.

c) On March 8, 2017, Employee-2 took Soriano and another Government employee to dinner at Bahama Breeze in Virginia Beach, Virginia, totaling $85.86. Employee-2 chose Bahama Breeze at Soriano's specific request. Employee-2 expensed the meal to CAMBRIDGE as a business meal.

d) On June 12, 2017, Thurston took Soriano to lunch at Rockin Baja Lobster Coastal Cantina in San Diego, California, totaling $53.33. Thurston expensed the meal to CAMBRIDGE as "business development."

e) On January 10, 2018, Soriano attended a CAMBRIDGE holiday party and dinner for San Diego based employees at Coasterra Restaurant in San Diego, California. CAMBRIDGE paid a total of $637.67 for the event. Thurston approved the expense report for the event as the "Primary Supervisor" and "Project Manager."

f) On February 8, 2018, – while in San Diego for AFCEA West, Thurston took Soriano, Individual-2 and another CAMBRIDGE employee to dinner at Island Prime restaurant in San Diego, California, totaling $697.12. Thurston expensed the meal to CAMBRIDGE as a "business dinner."

g) On June 5, 2018, Thurston took Soriano to dinner at Charley's Steak House in Tampa, Florida, totaling $908.43. Thurston expensed the dinner to CAMBRIDGE as a business meal.

h) On October 24, 2018, Thurston took Soriano to dinner at the Grant Grill, inside the U.S. Grant Hotel in San Diego, CA, totaling $89.43. Thurston expensed the meal to CAMBRIDGE as "business development."

i) On November 14, 2018, Employee-2 took Soriano, another Government employee and Individual-2 to dinner at Gordon Biersch Brewery in Virginia Beach, VA, totaling $109.26. Employee-2 expensed the meal to CAMBRIDGE.

j) On February 13, 2019, two CAMBRIDGE employees took Soriano and Liberty Gutierrez out to dinner and drinks at Bencotto Italian Kitchen, in San Diego, California, at a total cost of $362.01. The employees expensed the meal to CAMBRIDGE. Thurston approved the expense report as the employee's "primary supervisor" and as a "project manager."

k) On March 5, 2019, Thurston took Soriano and three other CAMBRIDGE employees to dinner at Buca di Beppo in San Diego, California, at the specific request of Soriano, totaling $201.05. Thurston expensed the meal to CAMBRIDGE.

l) On October 15, 2019, Thurston and Employee-2 took Soriano out to lunch with three other CAMBRIDGE employees at Coasterra in San Diego, CA, totaling $137.83. Thurston expensed the meal to CAMBRIDGE.

m) On October 15, 2019, Thurston took Soriano to dinner with four other Cambridge employees at Barleymash in San Diego, CA, totaling $389.29. Thurston expensed the meal to CAMBRIDGE.

In addition, as a thing of value and an overt act in furtherance of the conspiracy, on July 17, 2018, Soriano attended the Baseball All-Star game in Washington, DC with Employee-2 using a ticket purchased by CAMBRIDGE and given to him by Thurston. Soriano did not pay or provide reimbursement for the ticket. Soriano's ticket cost $2,113.59.

As additional overt acts in furtherance of the conspiracy, Thurston, as an agent of CAMBRIDGE, ensured that Soriano's family and friends received jobs at CAMBRIDGE as things of value to Soriano and at Soriano's specific request. Specifically:

a) On June 12, 2014, Soriano requested that CAMBRIDGE give a consulting job to a longtime friend, Individual-2. On or about December 2, 2014, Thurston ensured that Individual-2 was hired as a consultant by CAMBRIDGE earning $80/hour. Individual-2 remained at CAMBRIDGE as a consultant at Soriano's specific request through approximately July 2019.

b) On June 16, 2014, Soriano requested that CAMBRIDGE give a family member of Soriano's a job. Soriano provided CAMBRIDGE with a description for the position via email. Thurston interviewed the family member, and ensured he was hired by CAMBRIDGE initially in a part time remote position based in San Diego, California. After the family member graduated from college, in May 2015, Thurston ensured that the family member was hired by CAMBRIDGE as a full-time remote employee. Soriano's relative remained employed full time at CAMBRIDGE through 2018.

c) On April 6, 2016, Soriano asked Thurston if CAMBRIDGE would give a job to another friend. That same day Thurston reached out to Soriano's friend, and on May 2, 2016, Soriano's friend was hired at CAMBRIDGE as a consultant.

d) In February 2017, Thurston and Soriano jointly developed a position specifically for Liberty Gutierrez, a long-time friend of Soriano at CAMBRIDGE. This position allowed Gutierrez to work remotely in San

Diego as CAMBRIDGE had no office in San Diego. On February 9, 2017, Thurston sent Soriano Gutierrez's job description for the position which was called "Senior Management Analyst" for his approval. Soriano forwarded the position to Gutierrez. On the same date, Thurston sent Gutierrez an email asking when she would like to start. Soriano forwarded that email to Gutierrez as well allowing her to determine her start date.

e) On March 21, 2017, Cambridge officially offered Gutierrez a job as a Senior Management Analyst, with a start date of April 3, 2017 with an annual salary of $77,000 a year. Gutierrez was provided with a laptop, 2 monitors and an IP telephone which were shipped to her home in San Diego, California.

f) Gutierrez did minimal work for CAMBRIDGE. Soriano assisted Gutierrez in completing her yearly performance self-appraisals for CAMBRIDGE. Gutierrez had no day-to-day supervision at CAMBRIDGE. During the conspiracy, CAMBRIDGE paid Gutierrez a total of $178,460 between 2017 and 2019.

In return for this stream of benefits and in furtherance of the conspiracy Soriano agreed to perform official acts; to exert pressure on other officials to perform official acts; and to advocate before and advise other officials, knowing and intending that such advocacy and advice would form the basis for their official acts; all to advance CAMBRIDGE's business interests with regards to Department of Defense contracts, task orders, and contracting, as questions, matters, and controversies relating to that business were brought to Soriano's attention, and as opportunities arose. Soriano additionally agreed to do or omit to do acts in violation of his lawful duties. Specifically:

a) Soriano supported CAMBRIDGE with the September 26, 2014, award of Task Order HHSP233201400191W (the "191W Task Order") on the Chief Information Officer-Solutions and Partners 3 Government Wide Acquisition Contract ("GWAC"). The procurement was a competitive procurement through the Department of Health and Human Services Program Support Center ("PSC"). The task order was to provide systems engineering support to include design, engineering, integration, configuration management and testing of the Undersea Enterprise Network (UEN) and Nuclear Command, Control and Communications (NC3) systems for SPAWAR Systems Center Pacific (SSC PAC). The task order had a one-year base period of performance

and four one-year option periods. Soriano served as COR of the task order during the base year of performance, option year one, and option year two.

b) After the 191W Task Order was awarded, Soriano approved a series of "projects" on the Task Order, that increased the amount of work done by CAMBRIDGE on the Task Order. For example, on September 29, 2015, Soriano emailed PSC asking if $1.2 million could be added to CAMBRIDGE's 191W task order for "USN Data Centers." On or about September 30, 2015, Soriano forwarded Thurston an email from PSC that requested a Statement of Work for the $1.2 million of work, with the text "FYI!!!!" Thurston replied, "We are on it." On that same date, PSC issued Modification 3 to the 191W Task Order, adding $1.2 million in funding to the 191W Task Order for the Data Center project.

c) As a result of Soriano's assistance in placing work on the 191W Task Order, the Government ultimately obligated $32,700,466.49 on the 191W Task Order, at a total profit of $2,444,839.84 to CAMBRIDGE.

d) On February 13, 2017, shortly after Thurston and Soriano began discussions relating to Liberty Gutierrez's employment at CAMBRIDGE, Thurston reached out to Soriano to see if he would agree to take over the development of a task order, that Thurston had nicknamed C5ISR 2.0. Soriano agreed to do so.

e) On March 20, 2017, Thurston instructed another CAMBRIDGE employee to send Individual-2 an exclusive "Teaming Agreement". On March 21, 2017, CAMBRIDGE officially offered Liberty Gutierrez a job as a Senior Management Analyst, starting April 3, 2017, earning approximately $77,000 per year, and working from San Diego. The Company did so at Thurston's direction. A few days later, on March 24, 2017, the official competitive Request for Proposal ("RFP") was released for the C5ISR 2.0 task order under number C-38521-DV. The documents for that procurement were drafted by CAMBRIDGE employees and required that the bidding contractor have an engineering and logistics facility "within 25 miles of 1 Innovation Dr, Hanahan, SC 29410," even though the contract was supposed to be a SPAWAR contract, managed out of San Diego.

f) On April 14, 2017, CAMBRIDGE submitted its proposal for RFP C-38521-DV. Although Thurston knew that CAMBRIDGE employees had drafted the procurement documents, CAMBRIDGE affirmed in the proposal that "our VP of Defense and Intelligence Solutions reviewed the details of this TO for conflicts" and that the Company was "not aware of any actual or potential [Organizational Conflicts of Interest] that might prevent ethical participation in the C5ISR [Task Order]." CAMBRIDGE was the only bidder on RFP C-38521-DV.

g) On June 30, 2017, PSC awarded CAMBRIDGE the C5ISR 2.0 Task Order, HHSP233201700143W (the "143W Task Order"), with a total potential value of approximately $343,306,613.68. The task order was to provide Command, Control, Communications, Computers and Combat Systems (C5) Intelligence, Surveillance, and Reconnaissance (ISR) support and project services. The 143W Task Order had a base period of performance of July 3, 2017 through July 2, 2018, and four one-year option periods. Soriano served as COR of the task order. The contract ended in July 2019.

h) After the 143W Task Order was awarded, Soriano approved a series of "projects" on the 143W Task Order, increasing the amount of work done by CAMBRIDGE on the Task Order. On some projects CAMBRIDGE handled the majority of the work, on others, the Company passed through the majority of the work to subcontractors. In all, Soriano was involved in the approval and oversight of more than 70 projects on the 143W Task Order from various Department of Defense commands and agencies. As a result of Soriano's role on the 143W Task Order, the Government ultimately obligated $100,591,083.32 on the 143W Task Order, and paid CAMBRIDGE $83,636,447.17 for its work on the 143W Task Order. For the work that was paid by the Government, CAMBRIDGE made a total estimated profit of $4,985,155.39.

i) In October 2018, after learning that PSC would likely be shutting down the 143W Task Order to new work, Soriano worked with Thurston to develop alternative contract vehicles to ensure that CAMBRIDGE kept the work slated for the 143W Task Order. Between October 2018 and September 2019, Soriano allowed Thurston and other CAMBRIDGE employees to draft procurement documents for him, including Performance Work Statements, Request for Proposals, and Independent Government Cost Estimates, among other documents for competitive procurements and the Justification and

Approval Exception to Fair Opportunity, justifying sole sourcing efforts to CAMBRIDGE. Thurston and Soriano worked together to remove document properties on these documents so that PSC or other Government commands would not know CAMBRIDGE's involvement in drafting the documents.

In June 2019, PSC shut down all outside assisted acquisitions and put a hold on payment of certain work that had already been completed by various contractors, including CAMBRIDGE for whom over $13 million dollars remains unpaid for completed, accepted, and invoiced work. CAMBRIDGE admits and agrees that the total profit on the 191W Task Order and the paid portions of the 143W Task Order was $7,429,995.23.